UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. GRIGOR TERMENDJIAN, Defendant. | Case No. LA CR 23-00453(A)-JLS<br>Los Angeles, California<br>Thursday, September 25, 2025<br>(9:28 a.m. to 10:30 a.m.) |

TRANSCRIPT OF MOTION TO DISMISS COUNTS THREE THROUGH SIX OF THE SUPERSEDING INDICTMENT AS TIME BARRED UNDER 18 U.S.C. SECTION 3282 FILED BY DEFENDANT [91]
SEALED GOVERNMENT'S MOTION RE: TRIAL MATTERS [98]
BEFORE THE HONORABLE JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE

| | |
|---|---|
| Appearances: | See next page. |
| Court Reporter: | Recorded; CourtSmart |
| Courtroom Deputy: | Derek Davis |
| Transcribed by: | Jordan Keilty<br>Echo Reporting, Inc.<br>9711 Cactus Street, Suite B<br>Lakeside, California 92040<br>(858) 453-7590 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

For the Plaintiff: JULIA M. RUGG, ESQ.
RICHARD M. ROLWING, ESQ.
United States Department of Justice, Tax Division
150 M Street N.E.
Washington, D.C. 20002
(202) 598-3726

For the Defendant: ARIEL A. NEUMAN, ESQ.
WILLIAM E. JOHNSTON, ESQ.
Bird, Marella, Rhow, Lincenberg, Drooks & Nessim, LLP
1875 Century Park East
23rd Floor
Los Angeles, California 90067
(310) 201-2100

Los Angeles, California; Thursday, September 25, 2025 9:28

--o0o--

(Call to Order)

THE CLERK: Calling Item Number 1, Los Angeles Criminal 23-453-JLS, United States of America versus Grigor Termendjian.

Counsel, please state your appearances, starting with the Government.

MR. ROLWING: Good morning. Rich Rolwing for the United States. Good to be back, your Honor.

MS. RUGG: Julia Rugg for the United States.

THE COURT: Good morning.

MR. NEUMAN: Good morning, your Honor. Ariel Neuman for Mr. Termendjian, who is present in court.

MR. JOHNSTON: And William Johnston for Mr. Termendjian as well.

THE COURT: Good morning.

MR. JOHNSTON: Good morning, your Honor.

THE COURT: All right. We are here on two motions, one brought by the Defense to dismiss Counts 3 through 6 of the superseding indictment, one -- another motion brought by the Government relating to trial matters.

As to the second motion, that was filed under seal, and is there any reason that the Court then needs to seal the proceedings when we address the second motion?

MR. ROLWING: Not at this stage. I don't believe so. It depends on how the argument flows, but I don't think I'll be revealing any of the information that is subject to the seal.

We did file a redacted version publicly in accordance with the Court's order.

MR. NEUMAN: Your Honor, I -- I guess it does depend how the -- the argument goes. There is obviously an in camera portion that we have not seen. I don't know if there's a reply brief that we haven't seen because we did not see a reply brief. But there is one allegation that we're aware of that is attorneys' eyes only. And, to the extent we need to address that, I'd like to address that. I'll just note that I need to address it, and the Court can deal with that because it's -- it's attorneys' eyes only, and, so, my client in theory could not be exposed.

THE COURT: All right. So, to the extent you want to address that, you need to let me know in advance. I will close the proceedings, seal the transcript and for that portion only, have your client leave the courtroom.

MR. NEUMAN: Understood, your Honor.

THE COURT: All right. Let's start with the Defense motion, though so that we can address that first if you'd like to.

Yes. Step over to the lectern. Thank you. It's

always nice when counsel reads my mind.

MR. JOHNSTON: Good morning, your Honor. The Defense moves to dismiss Counts 3 through 6 of the indictment for exceeding the statute of limitations. The underlying transactions occurred more than five years ago, and the original indictment did not provide sufficient notice to Mr. Termendjian that a subsequent indictment would allege these specific transactions as violations of the concealment money laundering statute.

These are new transactions --

THE COURT: So, the transactions were identified in the original indictment, correct?

MR. JOHNSTON: They were, your Honor.

THE COURT: In paragraph 19 I think it was.

MR. JOHNSTON: Yes. They were --

THE COURT: Items P -- I can't remember the specifics. At the very end, the 2020 transactions?

MR. JOHNSTON: That's correct. But they were identified at most as transactions that would be 1957, because the descriptor in the paragraph -- and this is -- to direct the Court's attention, this would be 19(p). It says:

"They" -- referring to the conspirators -- "conducted and caused to be conducted millions of dollars of financial transactions involving taxable

proceeds from the Washakie fraud scheme
within the United States."

And then it goes on to identify those specific transactions.

And then in the original indictment, four of the transactions in that table were charged as 1957. So, if what the Government had done is say, Okay. We're going to take another set of four transactions in that same table and also charge those as 1957, essentially swap out, we wouldn't be here today. But what the Government did is they have now alleged that transactions, different transactions, yes, in that same table, but are a violation of a different statute, and this is a big deal because it's a key additional element.

1957, the mens rea is just do you know that the money involved has an illegal origin. 1956 is the intent and the purpose of the transaction to conceal the source, origin, destination of the funds.

THE COURT: So, let me ask you about Count 2. Count -- in the original indictment and in the superseding indictment. It's a conspiracy count, right?

MR. JOHNSTON: That's correct.

THE COURT: And it ips a conspiracy to commit concealment money laundering count, correct?

MR. JOHNSTON: It's a dual object conspiracy. So,

one of the objects is 1957 money laundering. The other object is 1956 concealment money laundering.

THE COURT: One moment. Let me take a look. Just one second.

(Pause.)

THE COURT: So, Count 2 titled 18 U.S.C. Section 1956(h), conspiracy to commit money laundering offenses, and is it your position that -- that -- that that -- that that particular count alleges both concealment and expenditure money laundering conspiracy?

MR. JOHNSTON: Yes, your Honor. If you look at 22(b), that's the 1957 object in 22(a), and this is -- I'm directing you -- your attention to the original indictment. The paragraph numbering in the superseder might be a little bit different, but --

THE COURT: That -- no, that's what I see here.

MR. JOHNSTON: Okay.

THE COURT: That's the language that I have highlighted is -- I'm -- I'm -- I specifically highlighted (a) because that's the concealment money laundering conspiracy, and then under manner and means, there's no distinction between the subparagraphs of paragraph 19 to which it is re-alleging. It just re-alleges paragraphs 19(a) through 19(p), and 19(a) through 19(p) are all of the above listed transactions, including the ones that are now

being alleged as concealment money laundering.

So, I guess I'm wondering how you're parsing that because the -- Count 2 says they engaged in a conspiracy to commit concealment money laundering over this time period here all the transactions that are relevant. It doesn't separate out these are concealment money laundering counts -- transactions, and these are expenditure transactions.

So, why wouldn't you have been on notice that they were alleging a conspiracy to engage in concealment money laundering and all of these transactions that we're listing here are relevant to that?

MR. JOHNSTON: Because we just looked at the language that the Government used. So, if you go back to -- there's two paragraphs --

THE COURT: You're just -- you're looking at that prefatory language that --

MR. JOHNSTON: Yeah, the prefatory language, and there is other language in paragraph 19 that does talk about what the concealment transactions are.

So, I'll direct your attention to 1911, and it says:

"They transferred and caused to be transferred some of" --

THE COURT: I'm sorry. 1911?

MR. JOHNSTON: Sorry. 19(l), your Honor.

THE COURT: Okay.

MR. JOHNSTON: 19(l), your Honor. No 1911. All right, 19(l). So, that paragraph -- subparagraphs says:

> They transferred and caused to be transferred some of the commingled fraud proceeds, mischaracterizes the repayment of loans to other business bank accounts for the purpose of concealing the nature, source, and ownership of the fraud proceeds."

THE COURT: Right.

MR. JOHNSTON: So, the Government is saying in the original indictment that only some of the transactions that are identified in the indictment are of a concealment nature, that it's not all of them. They don't say they caused to be trans -- to be transferred all of the commingled fraud proceeds to conceal them. It's some of them. And then they further identify, well, what are the exact transactions that are concealment? Well, they have to do with repayment of loans. And then there are other allegations in the indictment that talk about the concealment by designating them as loans.

I'll direct your attention, your Honor, to paragraph 20(p) and 20(s), which are in the overt act section. So, in 20(p), it says:

"On or about October 5th, 2015, Defendant Termendjian caused a Form 1065 to be filed with the IRS that mischaracterized the receipt of fraud proceeds as mortgages, notes, bonds payable in less than one year."

So, that -- the -- the money that came into Speedy Lion, if that's what they had charged as concealment money laundering, I don't believe we'd be here today saying, Well, we weren't on notice that of that transaction because that allegation is tied back to 1911.

And then if you look at 19 -- or, sorry -- 20(s), it says:

"In or about January 16, Jacob Kingston signed a false loan agreement, called The Additional Protocol of the Partnership Agreement that mischaracterized the transfer of $18 million fraud proceeds from Comack (phonetic) to a Speedy Lion investment account as a loan for the purchase of machinery for Comack."

So, again, a specific allegation that's telling us, Oh, okay, these are the types of concealment transactions that they're alleging. The ones that are in

20(p) -- sorry -- that are in -- in 19(p) aren't those types of transactions. There's no allegation in here that talks about Century Energy -- which is the account out of which now Counts 3 through 6 relate -- that anything to do with Century Energy has -- has a concealment purpose. There's no identification of saying that there were loans that were made to Century Energy that were now being repaid.

The reason why all of this matters, your Honor, is because there's a big difference between defending a conspiracy count where the gravamen of the offense is just the agreement. This -- as you've seen in all of our briefing to date, the focus of our defense was and is that there is no evidence of a conspiratorial agreement between Mr. Termendjian and his brother, Mr. Kormkaz or Mr. Kingston. That's what we have been preparing for, and when it came to the 1957 counts, we had focused our defense on the failure of the Government's tracing.

Now, they eventually realized their own deficiencies of their charges, and that's why they sought to swap it out. They were -- they were first under the misimpression that they could just pick another set of charges by reversing the tracing presumption. That doesn't fly in the Ninth Circuit.

So, it was really as a last resort that they've gone to 1956, not because this was part of the original plan

or even at trial they were going to allege that the Century Energy transactions were part of a concealment purpose. That was plainly not what was going to happen. If that was what the Government wanted to do and that's what they thought they had the best evidence of, well, they would have charged it because 1956 is a more serious charge than 1957. It has a higher stat max. It has a higher guidelines.

They were never going to do this, and they only reverted back to 1956 because it was the only transactions that were in statute that they could charge in the Ninth Circuit, and they didn't realize this till 21 months after this case showed up here.

That's what put us into a real -- it's a --

THE COURT: And I --

MR. JOHNSTON: -- prejudice to our defense.

THE COURT: I get all of that from your papers. So, I -- I get that. So, my question is this. In -- in other cases, in the case law generally, if you have a conspiracy that lasts -- that's alleged that will last a period of time and you have certain transactions that are alleged as part of that conspiracy -- and I know this is different. These are substantive counts, but -- and then the -- the Government adds additional transactions or if you have a wire fraud, if you have even a -- let's say they had a 1956 substantive count and then they've added additional

transactions that weren't included originally, how would your argument be any different? Because that does happen, and I've seen the same argument, We didn't know these transactions were going to be subject to it.

MR. JOHNSTON: I think it's -- we have to go back to the prefatory language in 19(p). That's what led us astray. That's what's caused us the prejudice here. If they had alleged simply these transactions in Table A and Table B are part of the concealment money laundering conspiracy and the 1957 conspiracy, then I don't believe we'd be here. But because they led us to believe that the transactions in Table B were part of a concealment money -- sorry -- an expenditure money laundering conspiracy, that didn't put us on notice that we were going to have to defend any transaction in there as a future -- as a potential future violation of concealment money laundering.

As your Honor knows, there's a big difference between defending substantive counts and conspiracy counts. And, as your Honor knows, in 1956 conspiracies, there's not even an element that there be an overt act. It -- the agreement is the whole ball game. So, you don't -- as a defense lawyer, you don't need to worry about the litany of allegations in a conspiracy if the only thing that you have to defeat is the agreement itself, and that's what we've been focused on, your Honor.

THE COURT: All right. Thank you.

Let me hear from the Government.

MR. ROLWING: Thank you, your Honor.

THE COURT: So -- so, just starting out, there's no question as to why the Government did what it did, right? You figured out, Oops, we can't in the Ninth Circuit conduct the tracing the way we had anticipated we could do that in terms of the commingling, et cetera.

MR. ROLWING: Correct.

THE COURT: And, so, now we're going to allege 1956 concealment money laundering.

MR. ROLWING: The grand jury charged Mr. Termendjian in Utah with both conspiracies and conducting individual money laundering transactions himself. That's what they returned. That's what he did. Those are the allegations. We then realized after the transfer for convenience -- and, by the way, the defense counsel has, although not today, but in his papers, falsely said over and over again that this case was brought in error in the wrong jurisdiction. That's not the finding of the Court.

When he transferred it, it was transferred for the convenience of the Defendant, not some finding that it was the wrong venue. We had venue in Utah.

THE COURT: Does that make any difference?

MR. ROLWING: No. But I'm just pointing out their

false narrative in their pleadings to try and enhance this what I consider a pretty simple argument that -- their argument is essentially -- even though it says it, we didn't read it to mean what it said because it's in this indictment.

THE COURT: Why did you -- why did you divide up the paragraph 19 into the two separate tables?

MR. ROLWING: They are certainly not -- neither of them specify concealment disguise or expenditure in excess of $10,000. None of those are derived that way. They may have read it that way, but that's not what they say. It's 19(a) through 19(p) that is incorporated as the manner and means. They -- they focus on one of those paragraphs.

So -- and then they say the Government was never going to do this in the original plan. The irony is that's exactly the opposite. The four transactions we wanted to charge in Utah are these four March of 2020 transactions. Five days after his brother is convicted of stealing all this money, he goes and engages in these financial transactions with the proceeds, $5 million. We did not charge them substantively because the tracing method we had always used consistently in all of our cases that are spinoffs and related to his was proceeds out first, and by the time March 2020 came out -- came -- came, all that money was gone. We couldn't trace a dollar under the proceeds out

first. So, that was March 2020.

So, they belonged in the conspiracy, not substantive charges.

Then, when we were proceeds out last theory under California law, we thought, Oh, we could charge them in California proceeds out last we have money, but then there's this strict tracing case of Yagman that undermines even that proceeds out last theory.

So, in order to avoid that legal argument of Yagman that -- and, by the way, we -- we -- before we superseded, we reached out to defense counsel in May, alerted them this was what we had uncovered, this was what we were going to do. We had no obligation to do that, but I thought it was a professional courtesy to inform defense counsel, Hey, we're not trying to pile on here. We're going to be superseding. We're going to be adding charges, and we had this discussion back and forth that went on for several weeks before we proceeded.

So, the original plan was always those four charges or those four transactions. That's why they're in the conspiracy, and that's why they're alleged. It's very particular. We allege not just Mr. Termendjian's Speedy Lion business as the business accounts he controls but the International Pita, the Vernon Truck Wash, the Century Energy, these other businesses that are involved in this

conceal and disguise money laundering in March of 2020. That's why it's in the conspiracy, and then if you read 19(l), it says they transferred money to other business bank accounts. Well, what other business bank accounts are we talking about? If we read the ones in the indictment he controls, it's those International Pita Bread, Petro Lion, Vernon Truck Wash, Century Energy. And then you go to, well, of all of those lists of transactions, there's only four that involve International Pita Bread, Petro Lion, Vernon Truck Wash, and Century Energy together, and that's those ones we've charged.

So, it's spelled out very clearly that he controlled these other business bank accounts. He transferred money to these other business bank accounts for the purpose of concealing and disguising. That's in 19(l), and then we list those in 19(p). All of that is incorporated in the money laundering conspiracy as the manner and means. It was always going to be, always going to be part of the trial that we were going to introduce evidence that he sat through the bulk of his brother's trial where he -- all the evidence was presented of his brother's involvement in stealing all this money. Then when the evidence was introduced about Speedy Lion and the -- his transactions with the $41 million of cashier's checks, Mr. Termendjian stopped coming to trial. It was about an eight-

week trial. He was there for about five and a half weeks, and then he never returned. After the evidence started zeroing in on his involvement, he didn't return. His brother's convicted. Five days later, he transfers the $5 million that he retained from this $40 million to his other business bank accounts. It was always going to be part of a trial. That's why it's charged as a conspiracy, and it's specified and described in all those multiple paragraphs.

We've pointed out not just 19(p) and the prefaced -- prefaced language in 19(p) which they say is somehow related to 57. It's not. There's no $10,000 or even expenditure language in 19(p). It's just these are the transactions we're going to be focusing on.

There are others, by the way. By -- by our reading of the law, when we are confronted with this issue, we believe they're on notice under the law that the whole scheme -- it's the same scheme, same facts, from March of -- I'm sorry -- September of 2013, when he got involved to March of 2020. That's what the allegation is. All of the transactions in that time period under this scheme involving this money, they're on notice to defend. They have to defend, even if they're not specified, because we've used, as we always do in these indictments, including the following, meaning there are others. And there are, indeed, others.

We could have chosen to charge, given that they were all out of statute at this time in 2025, the fact that he used Speedy Lion money, this fraudulent proceeds in the Speedy Lion account, to buy an apartment building that has nothing to do with Speedy Lion or Noble Fuel, that he used this money to buy a carwash. And we didn't -- we could have -- and come to this Court and said it's part of -- it's in the time period. It's in the scheme. It's -- even though it wasn't mentioned in the original indictment, it's part of the scheme, just like those other cases in which the Court upheld that sort of superseding indictment. We did not do that.

Instead, we chose four that were already specified, already described in detail. We not only gave them notice of the scheme, the facts, the conduct, the bank accounts, the businesses, the very checks, the dates, and we alleged the purpose for these particular four in 19(l) when we said he transferred money to his other business bank accounts for the purposes of concealing. That's what these four are alleging.

Finally, I will also say that -- maybe it's not a surprise because it's new counsel, but Mr. Termendjian's prior counsel before these gentlemen took over, in Utah, when we were investigating this conduct, we served subpoenas on Mr. Termendjian's entities related to these very four --

these transactions. We asked for the loan agreements, the transactions themselves, all the checks related to it. They moved to quash the subpoena. There was litigation in Utah surrounding moving to quash. And they eventually lost that, but in that discussion is when his prior attorneys were telling us those are just loans between companies. That's why these were noticed well before even the indictment. They were part of the litigation in the investigation.

But, in any event, when this -- when the original indictment was returned, they were very -- we took great pains to specify several paragraphs of language that put them on notice that Petro Lion, International Pita Bread, Vernon Truck Wash, the moneys he sent in March of 2020 to those were going to be part of this case in the conspiracy to commit 56(a)(1)(B)(I) and 57, conceal and disguise and expenditure. These are both -- because they exceed $10,000 under our original theory of tracing, they would have meant -- they would have -- well, no, actually they did not. In the original theory of tracing, they did not have the 57. There were only 56 because our tracing had proceeds out first. So, they didn't have any money in those last of the fraud proceeds. So, they were part of the conceal and disguise.

And, so, if the -- given their arguments that our tracing was flawed and Utah is different, they should have

also been on notice that this was charged as 56, not 57. Those -- as part of the conspiracy, that this -- those four transactions were charged as a 56 conceal and disguise part of the conspiracy, in particular, because our proceeds out first theory that we used.

So, their claim that it doesn't parse out, that at most it says it's 1957, is just not borne out by the plain language of these paragraphs and the conspiracies that alert them that not only of the statute, the transactions, the purposes, the dates, the checks, it's the identical factual basis. The scope of discovery was not broadened. No additional trial prep was necessary. This was always going to be part of the case.

THE COURT: All right. Thank you.

Any rebuttal?

MR. JOHNSTON: Just a few words in response, your Honor.

Mr. Rolwing introduced a lot of material and narrative that is outside the four corners of the indictment. We respectfully submit that that should be ignored.

When we go back to the indictment itself, again, this is a -- the question is did the indictment give sufficient notice to the Defense to start preparing to defend against particular charges. That's what the standard

is for the Court. If they had alleged things differently, again, we wouldn't be here today. But because they -- the concealment money laundering language refers to transactions involving loans and there's nothing in the indictment that describes Century Energy or International Pita or Vernon Truck Wash or any of these other entities as engaged in loans, that's what led us astray. That's why we suffered prejudice. That's why we weren't preparing for the types of charges that now we are facing in March of next year.

THE COURT: I'm sorry. Tell me what the relevance of -- the loan language?

MR. JOHNSTON: So, in 1911 --

MR. ROLWING: 19(l).

MR. JOHNSTON: Sorry. I keep on saying (l) -- 11, yeah. So, 19(l).

THE COURT: Yeah, but I -- but I -- but I have the -- the Code in my head now. So, I switch it from 11 to (l).

MR. PAUL: 19(l), that's where the Government alleged that the commingled fraud proceeds were mischaracterized as the repayment of loans for the purpose of concealing the nature, source, and ownership of the fraud proceeds. That's where we were led astray as to what types of transactions the Government was alleging were involved in the concealment part, because it is true that in a dual object conspiracy --

THE COURT: I'm -- I'm confused, though, because that's not the only paragraph that addresses concealment, is it?

MR. JOHNSTON: It's the only specific one.

THE COURT: It says in (a) they transferred and caused to be transferred millions of dollars in taxable proceeds from the Washakie fraud scheme through numerous entities in Turkey and Luxembourg to conceal the nature and source. Then it says in (b) they created, signed and caused to be created and signed documents that falsely characterized the transfers of fraud proceeds from the U.S. to Turkey and Turkey to the United States. They commingled -- in (c) they commingled funds from other sources with the Washakie fraud scheme proceeds for the purposes of disguising and concealing.

I mean, there's -- there's a lot. It's not just (l). I mean, (l) is there.

MR. JOHNSTON: And if Counts 3 through 6 charge transactions from Turkey to the United States, I'd agree with you, your Honor. That --

THE COURT: Because it's all U.S. is what you're saying?

MR. JOHNSTON: Exactly.

THE COURT: And everything else focused only on transactions that were international?

MR. JOHNSTON: Yeah. And, your Honor, it's -- I think it's -- the -- disingenuous for the Government to say that the counts -- the 2020 transactions would have been charged as 1956. That was the real plan all along.

Now. The real plan was to charge it as 1957 because there's a relaxed tracing requirement in 1956. So, whether you're in Utah or in the Ninth Circuit, you can transfer -- you can charge concealment and money laundering transactions the exact same way.

Both the Tenth Circuit and the Ninth Circuit have a relaxed tracing requirement for 1956. And, so, had they wanted to -- to charge the 2020 transactions involving Century Energy as 1956 and they thought that was the best evidence and the best fit for the charges, that's what they would have done, but they didn't because they really saw the Century Energy transactions as more appropriate for 1957. And, yes, there was a difference in the tracing rule that they were under. So, they picked the -- the October 2019 transactions rather than the March 2020, but the difference would have been which ones are charged as 1957, not which ones are charged as 1956.

Thank you, your Honor.

THE COURT: All right. Thank you.

MR. ROLWING: May I respond, your Honor?

THE COURT: Yes.

MR. ROLWING: Okay. Just quickly, your Honor is exactly right that 19(c) they commingled funds from other sources. That's not specific to Turkey and Luxembourg. That is an allegation that Mr. Termendjian commingled funds from his other business bank accounts that are listed in the indictment, Pita, Vernon, and International -- what's the one I'm missing -- International Pita Bread --

THE COURT: Century.

MR. ROLWING: -- Petro Lion. He commingled this money from these businesses that had nothing to do with Century Energy into the proceeds being held at Century Energy. That's what the evidence is going to show at trial. And then, after his brother was convicted, he transferred that money to the -- back to those business accounts in the form of -- I mean, what else could it be other than loans. What -- what -- there's no business Petro Lion or International Pita Bread had with Century Energy except their owner owns both of them. So, he's loaning money between or he's just engaged in raw illegal commingling. So, there's two options. They're both covered in here. He commingled, and he transferred and characterized them as repayment of loans or loans.

There's no other legitimate explanation for this conduct other than illegal and disguise and conceal. They're both involved. They're both alleged in 19(c) and

19(l) and it -- and then 19(p) when we describe in particular those four checks that were going to always be part of this trial and remain part of the allegation that they are conceal and disguise money laundering in a conspiracy and substantively.

And, so, when we were faced with this issue in the early part of this year, it took a little while to realize how best to react to a circuit difference that prejudiced the --

THE COURT: All right. I --

MR. ROLWING: -- Government.

THE COURT: I understand all that.

MR. ROLWING: Yeah.

THE COURT: You're not -- that's not a rebuttal --

MR. ROLWING: okay.

THE COURT: -- what he just said.

MR. ROLWING: Thank you, your Honor.

THE COURT: All right. Anything on the other -- that's it for this motion.

Anything that you wish to address on the motion regarding trial mattes?

MR. ROLWING: I will just add, your Honor, that Judge Parrish in Utah, when presented with this much, if not all, of the same evidence, took not only a partially anonymous jury but she had the jurors report to an

undisclosed location every morning to meet a U.S. Marshal who was disguised as a law clerk who drove them in a van into the basement of the courthouse, and then they left the courthouse in that same fashion. They weren't -- they weren't permitted to come to the courthouse separately in their own cars. So, every day for nine weeks -- eight or nine weeks, they reported offsite and were transported in by whom they thought was -- they were told was a law clerk, and then she had two other U.S. Marshals in the courtroom for security purposes that she also informed the jurors were law clerks as well for extra security.

Finally, we had the El Chapo -- the U.S. Marshals who were guarding El Chapo specifically designated and requested to come to Utah and transport Mr. Termendjian's brother every day in two SUVs, in full military gear and long guns to court every day.

THE COURT: Right. Just one -- one moment. I'm going to seal the transcript on this. I'm, going to close the courtroom. I should have done that probably earlier had I realized what you were going to be addressing.

**(Sealed portion of proceedings omitted.)**

(Proceedings concluded.)

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Jordan Keilty
Transcriber

10/20/2025
Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.